UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                      08-114

BYRON LADELL WILLIAMS                       SECTION "A"

### RULING ON MOTION TO SUPPRESS

Defendant Byron Ladell Williams has moved to suppress evidence seized when the New Orleans Police Department searched a vehicle in which he was a passenger.  The officers discovered a handgun and Defendant made incriminating statements to the officers pertaining to his custody of the weapon.  Defendant has been charged with being a felon in possession of a firearm.

This matter came on for hearing on August 5, 2008, and the presentation of evidence concluded on September 23, 2008.  Post-hearing memoranda were filed, and on October 30, 2008, the Court took the matter under advisement upon receiving the last of the post-trial memoranda.

The Court having now considered the evidence presented, the arguments of counsel, and the applicable law, DENIES Defendant's motion to suppress.

I.   **FACTUAL BACKGROUND**

Officer Brian Sullivan was the only witness present at the scene who testified at the hearing.  Officer Sullivan's testimony was uncontradicted and the Court found him to be a credible witness.  The following facts are based on his testimony.

On Sunday, March 30, 2008, New Orleans Police Officers Brian Sullivan and Joseph Lusk were on proactive patrol in areas of the city known for high narcotic and criminal activity.  On that particular day they were assigned to the whole Algiers area in the Fourth District.  At approximately 3:00 p.m. the officers drove by the Hollypark apartment complex, an area that the officers considered a high crime area due to past incidents on the property.  Sullivan testified that the manager of the complex had previously asked NOPD for help and for extra patrols in the area given past problems with crime on the premises.  Ms. Swantarha Smith, the manager of the Hollypark Apartments, testified at the hearing and confirmed this assertion.

According to Officer Sullivan, he and Officer Lusk drove by the complex and observed a white Maxima double-parked behind another vehicle thereby blocking it from leaving.  The officers drove by and circled back toward the vehicle and as they neared the vehicle they noticed that the backseat passenger was ducking down as if to avoid being seen by the officers.  The officers

2

positioned their marked unit behind the Maxima about a car length away.  The backseat passenger was later identified as Defendant, Byron Williams.

Sullivan testified that Defendant was still ducking down after Sullivan exited his vehicle and began to approach the Maxima but then Defendant came up and positioned himself vertically.  Sullivan stated that Defendant then began hunching down with his hands down toward his legs near the floorboard. Sullivan testified that Defendant's body movements made him concerned that Defendant was possibly concealing a gun.  Sullivan then opened the rear passenger door where Defendant was seated and asked him to step out of the vehicle.  Sullivan stated that he asked Defendant to step out of the vehicle out of safety concerns.  Defendant stepped out of the vehicle and Sullivan walked him over to Officer Lusk who detained him near the police unit.

Sullivan then went back to the Maxima and observed a black semiautomatic Mac-10, 9 millimeter handgun sitting upright on the floorboard.  According to Sullivan, the gun was now in plain view and visible while standing outside the car.  As Sullivan reached in to retrieve the gun Defendant pushed off the police car and attempted to flee.  Sullivan helped Lusk to capture and handcuff Defendant.  The officer placed Defendant in the back of the

police car and Lusk read him his Miranda rights.  Once inside the police car Defendant confirmed that he was a convicted felon. According to the police report Defendant also made incriminating statements regarding the gun while inside the police car.

## II.  **ARGUMENTS, LAW, AND ANALYSIS**

Defendant argues that the officers had no legal authority to approach the Maxima or to seize its occupants.  Defendant contends that the officers effectuated a traffic stop without probable cause and then proceeded to unlawfully search the vehicle.  Therefore, according to Defendant, the gun should be suppressed.

Defendant also argues that the incriminating statements that he made to the officers after he was handcuffed in the police car must be suppressed pursuant to the fruit of the poisonous tree doctrine.  Defendant contends that the statements stemmed from the initial illegal seizure of the Maxima and then from Defendant's subsequent illegal seizure when he was placed under arrest without probable cause to believe that he had committed any crimes.  Defendant argues that the statement flowed from one unbroken chain of events beginning with his unlawful detention at the Maxima.

The Government not only opposes the motion to suppress but has filed a motion to dismiss Defendant's motion to suppress for

4

lack of standing.  The Government argues that Defendant lacks standing to challenge the search of the Maxima because he was only a passenger in the vehicle.  The Government also argues that no traffic stop occurred under these facts and that at most the encounter was a <u>Terry</u>[1] stop supported by reasonable suspicion.

The Fifth Circuit has recognized that police-citizen contact can be broken down into three "tiers." <u>U.S. v. Watson</u>, 953 F.2d 895, 897 n.1 (5th Cir. 1992).  In the first tier, mere communication between an officer and citizen which involves no coercion or detention, does not implicate the Fourth Amendment. <u>Id.</u> (citing <u>U.S. v. Zukas</u>, 843 F.2d 179, 181-82 (1989)).  The second tier is an investigatory stop, which is a brief seizure that must be supported by a reasonable suspicion on the part of the law enforcement officer.  The third tier, is a full scale arrest, which must be supported by probable cause that the defendant has committed a crime.  <u>Id.</u>

A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer "by means of physical force or show of authority" restrains his freedom of movement.  <u>Brendlin v. California</u>, 127 S. Ct. 2400, 2405 (2007) (citing <u>Florida v. Bostick</u>, 501 U.S. 429

---

[1] <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

(1968); <u>Brower v. Country of Inyo</u>, 489 U.S. 593 (1989)).  When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority and when it does not.  <u>Id.</u>  A seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  <u>Id.</u> (quoting <u>U.S. v. Mendenhall</u>, 446 U.S. 544, 554 (1980)).  The detention of individuals during the stop of an automobile by the police constitutes a "seizure" for Fourth Amendment purposes.  <u>Whren v. U.S.</u>, 517 U.S. 806, 809 (1996).  An automobile stop is therefore subject to the "constitutional imperative" that it be reasonable under the circumstances.  <u>Id.</u> at 810.  All of the occupants of the vehicle have standing to challenge the validity of the stop, <u>see</u> <u>Brendlin</u>, 127 S. Ct. at 2407, and the police can lawfully order a passenger to step out of a lawfully stopped vehicle, <u>Maryland v. Wilson</u>, 117 U.S. 882 (1997).

The Court's analysis necessarily begins with the question of whether the initial encounter with the officers was a seizure, and if so, a lawful one.  The encounter began when the officers drove by the complex and noticed the double-parked vehicle.  They

decided to circle back and enter the parking lot.  Because the
Maxima was parked on private property the officers had no basis
to assume that its driver was in violation of the law, but they
needed no justification to enter the parking lot.  The police
could lawfully pull into the complex's parking area to get a
closer look at the Maxima, and given that the management of the
complex had expressly invited them to do so, they could hardly be
considered trespassers.  And like any citizen, the police were
free to approach the parked vehicle to initiate a "tier 1"
communication with the driver and the passengers.  The officers
needed no justification for their actions until the point when
the encounter became a "stop," thereby crossing into the realm of
a tier 2 contact.

     Two Fifth Circuit cases with facts very similar to these but
with very different outcomes convince the Court that the initial
encounter in this case was lawful.  In United States v. Beck,
officers were passing through a predominately black, high-crime
neighborhood when they noticed an automobile with two black males
parked on the left side of the road with its engine running.  602
F.2d 726 (5th Cir. 1979).  The officers pulled their patrol car
alongside the parked vehicle so close that they could not exit
their own vehicle.  They questioned the driver and the passenger
who seemed extremely nervous and who were making furtive

movements as if something were being passed between them.  When
the officers moved the patrol car forward so that they could exit
they observed the driver throw a marijuana cigarette out of the
window.  The officers arrested the occupants of the vehicle and
an impound search of the vehicle revealed contraband that formed
the basis for Beck's conviction.

On appeal the Fifth Circuit concluded that the abandoned
marijuana cigarette, which formed the basis for the arrest and
subsequent impound search, was the product of unlawful police
action.  Beck, 602 F.2d at 728.  The court characterized the
initial encounter as a Terry stop because by pulling their police
car so close to Beck's vehicle he and his passenger were not free
to leave.  Id. at 729.  The court went on to conclude that the
stop was not based upon reasonable suspicion that criminal
activity was afoot because "[t]here is nothing inherently
suspicious about two black men sitting in a parked car, with or
without the engine running, on a street in a black neighborhood
on a midsummer afternoon."  Id.  The court observed that Beck and
his passenger had not broken any traffic laws and there was no
evidence of any recent crimes in the area or any reason to
suspect that Beck and his passenger were wanted by the police.
Id.  The court rejected the officers' "unfounded feeling that
something might be afoot" as a justification for the stop.  Id.

The court explained that if the officers had observed the vehicle for some time and had seen Beck or the passenger do something suspicious then the stop might have been permissible.  Id.

In stark contrast to the outcome in Beck, the Fifth Circuit later found that a similar stop was supported by reasonable suspicion in United States v. Watson, 953 F.2d 895 (5th Cir. 1992).  In that case Jefferson Parish deputies were patrolling in the wee hours of the morning in a high crime known especially for drug trafficking.  The officers observed Watson drive into the parking lot of an abandoned gas station where he turned off the headlights and killed the engine.  The officers then decided to circle back and they stopped their patrol car near Watson's vehicle.  As the officers exited the car they observed Watson move his body in such a way to suggest that he might be concealing something or retrieving something on the car floor. The officers ordered Watson and his passenger out of the vehicle and then observed a loaded and chambered semi-automatic pistol in plain view.  A consensual search of the car revealed crack cocaine hidden in the car's defroster vent.

Watson argued that the cocaine should be suppressed because the officers lacked reasonable suspicion to conduct a Terry investigatory stop.  Watson argued that under United States v. Beck, supra, reasonable suspicion is not present merely because

two black men are sitting in a parked car in a high crime
neighborhood.   The district court denied the motion.

The Fifth Circuit affirmed and pointed out crucial
differences between Watson's stop and that in Beck.   Watson, 953
F.2d at 897.   First, the court noted that the encounter in Beck
had taken place during the afternoon whereas in Watson the events
occurred at 3:30 a.m.   Id.   Also, the defendants in Beck were
simply standing beside their vehicle when the officers approached
whereas in Watson the defendants had pulled into an abandoned gas
station where they turned off their headlights and later stopped
the car.   Id.   Finally, the officers in Watson had noticed
furtive gestures and actions on the part of the suspects that
occurred before the stop whereas in Beck the nervous actions on
the part of the defendants had occurred after the stop.   Id.
According to the Fifth Circuit the stop did not occur until the
officers ordered Watson out of his vehicle.   Id. at 897 n.3.   The
court was persuaded that the facts in Watson presented a more
suspicious set of circumstances to support reasonable suspicion
whereas in Beck they did not.   Id.

Although the instant case presents a close call, the Court
is persuaded that a stop did not occur until Sullivan ordered
Defendant out of the vehicle.   Unlike the officers in Beck who
clearly used their own car to restrain the movements of Beck and

10

his passenger, Sullivan and Lusk did not park their vehicle right upon the Maxima opting instead to stay back by a car length. Sullivan then approached the vehicle on foot to initiate contact, and just as in <u>Watson</u> he observed Defendant making suspicious movements inside the vehicle.  As in <u>Watson</u>, there was no coercion or detention, and therefore no stop, until Defendant was asked to step out of the vehicle and cooperated.

Further, as in <u>Watson</u> the conduct that gave rise to the reasonable suspicion necessary to support the ultimate stop occurred before the stop was effectuated.  Sullivan and Lusk had previously noticed Defendant trying to duck down to avoid being seen.  They also knew that they were in a high crime neighborhood and that the management of this particular complex had asked for additional police help with crime on the premises.  As Sullivan approached the Maxima, Defendant was seen reaching down near his feet as if he were trying to conceal something or possibly reach for a weapon.  The Court is convinced that the facts of this case present a stronger case for reasonable suspicion than did those in <u>Beck</u>.  And unlike <u>Beck</u>, the facts giving rise to reasonable suspicion occurred before the stop.  Thus, the Court concludes that the officers' actions in conducting the stop were supported

by reasonable suspicion.[2]

Although the gun was in plain view once the car door was opened and Defendant had left the backseat area, opening the door of the Maxima was a search under the law in this circuit.  U.S. v. Meredith, 480 F.3d 366 (5th Cir. 2007); see also New York v. Class, 475 U.S. 960 (1986) (recognizing that an intrusion into the interior of a vehicle constitutes a search).  However, as a passenger in the vehicle Defendant lacks standing to challenge the search.[3]  U.S. v. Short, 181 F.3d 620, 623 (5th Cir. 1999). Even if Defendant had standing to challenge the search, Sullivan's decision to open the door was reasonable under the circumstances.  Sullivan observed Defendant moving in such a way as if he might possibly be reaching for a weapon near his feet

---

[2] The Government relies heavily on the Maxima being double-parked as a justification for the stop.  The validity of the Maxima's choice in parking is not pertinent because the Court has already concluded that the officers needed no justification to initiate tier 1 contact with the parked vehicle.  However, the Court does find it implausible that two active patrol NOPD officers were so concerned with parking issues at the complex that they would venture onto private property to confront the driver of the Maxima.  Nonetheless, the officers' subjective belief as to the facts supporting reasonable suspicion do not control this Court's objective analysis of the facts supporting the legality of the encounter.  See, e.g., U.S. v. Cooper, 949 F.2d 737, 744-45 (5th cir. 1991) (citing Fla. v. Royer, 460 U.S. 491 (1983)).

[3] The Court is aware of no facts to suggest that Defendant had any type of property interest in this vehicle or a reasonable expectation of privacy with respect to its contents.

and he did so while knowing that a police officer was approaching
the vehicle   The area was known to be a high crime area which
according to Ms. Smith included shootings.  Sullivan testified
that he opened the door out of concern for his own safety at that
point and such conduct was certainly reasonable.  The gun was
found in plain view on the floor.  The gun was not found as the
result of an unlawful seizure or search and it is therefore not
subject to suppression.

     Likewise, the incriminating statements that Defendant made
after the custodial arrest are not subject to suppression.
Probable cause for a warrantless arrest exists when the totality
of facts and circumstances within a police officer's knowledge at
the moment of arrest are sufficient for a reasonable person to
conclude that the suspect had committed or was committing an
offense.  U.S. v. Wadley, 59 F.3d 510, 512 (5th Cir. 1995)
(citing Harper v. Harris County, 21 F.3d 597 (5th Cir. 1994))

     The officers knew that the Hollypark complex was known to be
a high crime area with a high incidence of drug trafficking and
shootings.  The gun, while not implicitly illegal, contained 25
live rounds with a bullet already in the chamber.  According to
the police report, the safety was set on "fire" with a piece of
black electrical tape holding it in that position.  (Rec. Doc.
53, Exh. B).  When Williams knew that Sullivan had found the gun

13

he attempted to flee from the police.  Standing alone, a
suspect's attempt to flee is generally not sufficient to create
probable cause but in combination with other facts and
circumstances flight from an officer is a factor that the police
can consider in the probable cause determination.  <u>Wadley</u>, 59
F.3d at 512.  Based on the totality of the circumstances the
officer's were not unreasonable in placing Williams under arrest
once he was captured.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Supress (Rec. Docs. 18 &
36)** filed by Defendant is **DENIED;**.

**IT IS FURTHER ORDERED** that the **Motion to Dismiss (Rec. Doc.
20)** filed by the Government is **DENIED**.

November 4, 2008

Judge Jay C. Zainey
United States District Court

14